# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| BRYAN BIRKES, LARAYZA COLLINS, JAMES MUSUMECI, SUMMER PASCO, JOSHUA STEVENS, and<br><br>INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS LOCAL 3180, CLARKSVILLE PROFESSIONAL FIRE FIGHTERS ASSOCIATION<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CLARKSVILLE, TENNESSEE,<br><br>FREDDIE D. MONTGOMERY, JR., in his individual capacity and in his official capacity as the Fire Chief of the CITY OF CLARKSVILLE, TENNESSEE,<br><br>Defendants. | CIVIL ACTION NO.<br>JURY DEMAND |

## COMPLAINT

Plaintiffs, Bryan Birkes, Larayza Collins, James Musumeci, Summer Pasco, Joshua Stevens, and International Association of Fire Fighters Local 3180, Clarksville Professional Fire Fighters Association ("IAFF Local 3180" or "Union"), by and through their undersigned counsel, bring this Complaint against Defendants, the City of Clarksville, Tennessee ("City") and Freddie D. Montgomery, Jr., the Fire Chief of Clarksville Fire Rescue ("Department" or "CFR").

IAFF Local 3180, the labor union that represents fire fighters employed by the City of Clarksville, began a campaign in May 2025 to advocate for better pay for fire fighters to improve the Fire Department's poor retention rate and attract qualified fire fighter candidates to improve services to the City's citizens and Department morale. The Union held public rallies, circulated

information on social media, conducted interviews with news media, and lobbied the City Council for improvements. Much of the Union's and the fire fighters' speech associated with the campaign was critical of the City for paying its fire fighters substandard wages, which was causing the City's fire fighters to leave for jobs in surrounding cities and inhibiting the Department's ability to attract candidates to serve as CFR fire fighters to serve the community.

While the City refused to take any action in response to the Union's campaign, the Union's campaign gained significant media attention and, as a result, IAFF Local 3180's membership grew substantially. Plaintiffs Birkes, Collins, Musumeci, Pasco, and Stevens are former Probationary Fire Fighters employed by the City who were actively involved in the Union's campaign.

In July 2025, Defendants summarily terminated Birkes, Collins, Musumeci, Pasco, and Stevens because of their protected First Amendment activities associated with the Union's campaign. Then, on November 18, 2025, Defendants implemented a new official policy prohibiting fire fighters from joining any association without approval from Fire Chief Montgomery. This policy also banned fire fighters from joining any association which may "reflect negativity" on the City – *i.e.*, the Union.

Plaintiffs bring this action to redress Defendants' unlawful termination of Birkes, Collins, Musumeci, Pasco, and Stevens in retaliation for exercising their protected rights under the First Amendment and state law. Plaintiffs also challenge the City's newly implemented policy because it unconstitutionally constrains the First Amendment rights to free association of the Union and its members.

<u>**Introduction, Jurisdiction and Venue**</u>

1. This is a civil action brought under 42 U.S.C. § 1983 for violations of the Plaintiffs' rights secured by the First and Fourteenth Amendments of the United States Constitution,

including the rights to free speech, free association, to petition the government for redress of grievances, and to equal protection under the law. Plaintiffs also assert a related claim under the Tennessee Public Employee Political Freedom Act ("PEPFA"), Tenn. Code Ann. § 8-50-603, et seq. Plaintiffs seek declaratory and injunctive relief, reinstatement, back pay, damages, and attorneys' fees and costs.

2. This Court has original jurisdiction over Plaintiffs' claims brought under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. This Court has authority to award the requested monetary damages pursuant to 28 U.S.C. § 1343, to award the requested costs and attorneys' fees under 42 U.S.C. § 1988, and to issue a declaratory judgment and other just and appropriate relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all of the Plaintiffs and Defendants are located in this district, and the events complained of herein took place in this district.

**Parties**

4. Plaintiff Bryan Birkes is an individual who resides in Montgomery County, Tennessee. Birkes is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983, a "person" within the meaning of 42 U.S.C. § 1983, and an "employee" of a public employer within the meaning of Tenn. Code Ann. § 8-50-603. He was employed by Defendant City of Clarksville as a Probationary Fire Fighter with Clarksville Fire Rescue at all relevant times.

5. Plaintiff Larayza Collins is an individual who resides in Montgomery County, Tennessee. Collins is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983, a "person" within the meaning of 42 U.S.C. § 1983, and an "employee" of a public employer within

3

the meaning of Tenn. Code Ann. § 8-50-603. She was employed by Defendant City of Clarksville as a Probationary Fire Fighter with Clarksville Fire Rescue at all relevant times.

6. Plaintiff James Musumeci is an individual who resides in Montgomery County, Tennessee. Musumeci is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983, a "person" within the meaning of 42 U.S.C. § 1983, and an "employee" of a public employer within the meaning of Tenn. Code Ann. § 8-50-603. He was employed by Defendant City of Clarksville as a Probationary Fire Fighter with Clarksville Fire Rescue at all relevant times.

7. Plaintiff Summer Pasco is an individual who resides in Montgomery County, Tennessee. Pasco is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983, a "person" within the meaning of 42 U.S.C. § 1983, and an "employee" of a public employer within the meaning of Tenn. Code Ann. § 8-50-603. She was employed by Defendant City of Clarksville as a Probationary Fire Fighter with Clarksville Fire Rescue at all relevant times. During her employment, she used her former last name, Summer Myatt. She changed her name to Summer Pasco in approximately September 2025.

8. Plaintiff Joshua Stevens is an individual who resides in Montgomery County, Tennessee. Stevens is a "citizen of the United States" within the meaning of 42 U.S.C. § 1983, a "person" within the meaning of 42 U.S.C. § 1983, and an "employee" of a public employer within the meaning of Tenn. Code Ann. § 8-50-603. He was employed by Defendant City of Clarksville as a Probationary Fire Fighter with Clarksville Fire Rescue at all relevant times.

9. Plaintiff IAFF Local 3180 is a labor organization that represents fire fighters employed by Defendant City of Clarksville and working for Clarksville Fire Rescue. Local 3180 is a "person" within the meaning of 42 U.S.C. § 1983.

10. Defendant City of Clarksville, Tennessee is a municipality incorporated and

4

established under the laws of Tennessee and located within Montgomery County, Tennessee. The City is a "person" within the meaning of 42 U.S.C. § 1983 and a public employer within the meaning of Tenn. Code Ann. § 8-50-603, et seq. and Tennessee common law. The City operates Clarksville Fire Rescue and is responsible for establishing and enforcing official municipal policies, practices, and customs governing the employment of its fire fighters.

11. Defendant Freddie D. Montgomery is the Chief of Clarksville Fire Rescue, a department of the City that provides fire protection, rescue, and emergency medical services to the City and surrounding areas. Pursuant to Clarksville Code of Ordinances Sections 7-202, 7-204, 7-303, 7-403, and 1.5-502.5, Chief Montgomery has authority over the operations and personnel of the Fire Department, including supervising department members, directing fire-prevention and fire-protection activities, enforcing and modifying the fire code, effectively recommending additional ordinances or amendments to City Council, and terminating employees. As such, Chief Montgomery has the authority to, and in fact does, make policies on behalf of the City as they relate to Clarksville Fire Rescue, including policies related to the employment of City employees working for CFR. Moreover, Defendant Chief Montgomery acted directly or indirectly in the interest of the City in relation to Plaintiffs' employment and exercised significant control over the terms and conditions of their employment, including disciplinary authority, supervision, and participation in termination decisions. Chief Montgomery is an "officer" of the City and a "person" within the meaning of 42 U.S.C. § 1983.

**Factual Background**

12. Plaintiff Birkes was employed by the City as a Probationary Fire Fighter with Clarksville Fire Rescue. He began his employment on February 26, 2024, and his probationary period was scheduled to conclude on August 26, 2025. Weeks before his probationary period was

5

set to end, he was terminated on July 8, 2025.

13. Plaintiff Collins was employed by the City as a Probationary Fire Fighter with Clarksville Fire Rescue. She began her employment on September 23, 2024, and her probationary period was scheduled to conclude on March 23, 2026. She was terminated on July 8, 2025.

14. Plaintiff Musumeci was employed by the City as a Probationary Fire Fighter with Clarksville Fire Rescue. He began his employment on February 26, 2024, and his probationary period was scheduled to conclude on August 26, 2025. A few weeks before his probationary period was set to end, he was terminated on July 25, 2025.

15. Plaintiff Pasco was employed by the City as a Probationary Fire Fighter with Clarksville Fire Rescue. She began her employment on February 26, 2024, and her probationary period was scheduled to conclude on August 26, 2025. A few weeks before her probationary period was set to end, she was terminated on July 25, 2025.

16. Plaintiff Stevens was employed by the City as a Probationary Fire Fighter with Clarksville Fire Rescue. He began his employment on February 26, 2024, and his probationary period was scheduled to conclude on August 26, 2025. Weeks before his probationary period was set to end, he was terminated on July 8, 2025.

17. At all relevant times, probationary fire fighters at CFR were not entitled to the same procedural protections afforded to non-probationary fire fighters. Under the City's policies, probationary fire fighters may be released from employment without access to internal appeal or grievance procedures. As a result, Plaintiffs had no internal mechanism to challenge or appeal their terminations. Clarksville, Tenn. Code of Ordinances § 1.5-502.5(d).

18. The City's fire fighters are represented by the International Association of Fire Fighters Local 3180, Clarksville Professional Fire Fighters Association.

6

19. For years, CFR has had a contentious relationship with the Union representing its fire fighters. Department leadership regularly expressed opposition to union membership and activity, creating an environment in which union involvement was discouraged.

20. CFR's discouragement of union involvement would begin during recruit training. Specifically, CFR's Training Captain, Mark Chandler, would regularly tell recruits not to get involved with the Union, that people in the Union created issues, that CFR "won't hesitate to fire people" associated with the Union, and CFR refuses to entertain the Union as a whole. Captain Chandler would speak to CFR's fire fighters about the Union negatively, stating that the Union "created issues," that its members were "not aligned with Chief Montgomery," and "caused trouble." Upon information and belief, Training Captain Chandler made similar comments to each recruit class dating back to at least 2021.

21. During recruit training, Defendant Chief Montgomery also addressed the CFR's probationary fire fighters, cautioning them to remember why they were hired and to not "fall into the negativity of the group of people" within CFR, referring to the Union. He advised recruits to surround themselves with "the right people" and stated that he was not afraid to terminate employees. Upon information and belief, similar comments were made to each recruit class dating back to at least 2021.

22. At all relevant times, CFR personnel were prohibited by Defendant Chief Montgomery from using the Department's communication system to discuss union-related matters, although he permitted use of the system for other non-work related communications.

23. The anti-union attitude within CFR was not limited to recruit training; it extended into everyday work life. On or about January 22, 2023, 16 CFR fire fighters from C-shift—15 of whom were Union members—attended a sporting event outside of work hours instead of a

7

voluntary department gala. On or about January 23, 2023, Defendant Chief Montgomery retaliated by reassigning several of those fire fighters to different shifts and stations. Notably, only the most active union members and union leadership were reassigned.

24.     Also on January 22, 2023, Defendant Chief Montgomery sent an email to Fire Fighter Daniel Pasco—Plaintiff Pasco's husband—criticizing the "embarrassing gala showing" as "proof of the old culture" and warning against "the pressure of a few that are in their last years of resisting change." Chief Montgomery stated that the fire fighter was hired "to be a part of change." Upon information and belief, these statements were references to union-affiliated fire fighters and reflected the Department's longstanding hostility toward union membership.

25.     In July 2024, Plaintiff Birkes became a member of the Union.  Upon information and belief, Defendants were aware that Birkes joined the Union. After joining the Union, Birkes received warnings from multiple individuals within CFR, including Battalion Chief Kevin Finch, advising him to "be careful."

26.     In January 2025, Plaintiff Pasco joined the Union. Upon information and belief, Defendants were aware that Pasco joined the Union.  After joining, she likewise received several warnings from CFR supervisors. For example, Assistant Chief Randy Ellis, cautioned her "not to involve [herself] with the Union." Similarly, Captain Chandler warned her to "watch out," upon learning of her Union affiliation. Lieutenant Dale Hardwick called Plaintiff Pasco and told her that joining the union was "career suicide." These sentiments were also echoed by Captain Tommy Jones.

27.     After joining the Union, Plaintiff Pasco also observed a notable change in Defendant Chief Montgomery's interactions with her. On multiple occasions, after she joined the Union, Chief Montgomery did not respond when she greeted him and otherwise appeared to avoid

engaging with her.

28. On May 5, 2025, after Plaintiff Collins attended a union meeting, Training Captain Chandler texted her asking if she joined the Union.

29. On May 15, 2025, Local 3180, with the assistance of community members, launched a public campaign advocating for increased wages for CFR fire fighters to address significant pay disparities with surrounding communities as a means of attracting and retaining skilled and experienced fire fighters to improve CFR and its ability to protect and service the citizens of Clarksville. The campaign was rooted in the reality that CFR fire fighters earned among the lowest wages for fire fighters in the State of Tennessee, with a starting salary of $44,000.00 per year. This starting salary is approximately $10,000.00 less than fire fighter starting salaries in surrounding communities. The campaign also sought to address the operational problems within the CFR caused by these disparities, including chronic understaffing, high turnover, low morale, and fire fighter fatigue from being required to work second jobs in order to earn a living.

30. In approximately May 2025, while working his second job, Plaintiff Birkes was asked by a community member, Josh Gillette, why he maintained additional employment. Plaintiff Birkes explained that his position with CFR did not provide sufficient income to make ends meet. This shocked Mr. Gillette, and in response, he offered to advocate for improved fire fighter pay through a local public Facebook platform with over 2,000 members known as "Clarksville Connect." Plaintiff Birkes agreed to Mr. Gillette's offer, as he believed it would be a beneficial opportunity to raise awareness within the Clarksville community.

31. The Clarksville Connect Facebook Page is operated by Jurnee Gillette, who supervised Plaintiff Stevens at his second job with Benchmark Realty, LLC. At all relevant times, Defendants were aware of the Clarksville Connect Facebook Page, that Ms. Gillette operated the

9

page, and of Ms. Gillette's association with Plaintiff Stevens. Upon information and belief, Defendants monitored the Clarksville Connect Facebook Page.

32. Plaintiffs supported the Union's initiative to improve retention rates and address understaffing issues within CFR by securing fair wages for Clarksville fire fighters and participated in various union activities to promote this effort. During the relevant period, several Plaintiffs, including Plaintiffs Birkes, Musumeci, and Pasco, were members of the Union. All Plaintiffs, regardless of union membership status, demonstrated public support for the Union's wage campaign through attendance at meetings, participation in rallies, or public advocacy.

33. Early on, Plaintiff Birkes played an active role in supporting the Union's wage initiative. He assisted in circulating information about the Union's campaign to other fire fighters and helped raise awareness regarding the effort. He also ordered and distributed Union t-shirts and stickers at public Union rallies.

34. On May 23, 2025, Plaintiff Birkes emailed all members of the Clarksville City Council to express concerns about fire fighter pay, low retention rates, and related safety and mental health issues, including the public safety implications of understaffing and fire fighter fatigue from having to work second jobs, in support of the Union's campaign. In his email, he noted that low wages were contributing to retention issues and often required fire fighters to work second jobs.

35. On May 26, 2025, Plaintiff Pasco created a petition titled "Petition for Fair Pay and Support for Clarksville Firefighters" in support of the Union's campaign for fair wages. See https://www.change.org/p/call-to-action-for-cfr-firefighters. Pasco was the first signatory on the petition and also circulated the petition outside of the workplace to other CFR fire fighters and community members. The petition was subsequently also signed and circulated by Plaintiffs

10

Birkes, Collins, Musumeci, and Stevens. A printed copy of the petition with all collected signatures was physically displayed by Local 3180 President Jesse Snyder ("Union President Snyder") during a City Council meeting. Currently, the petition has over 2,200 supporters who have signed the petition.

36.     On May 27, 2025, Plaintiff Musumeci emailed Nick Beres, a NewsChannel 5 reporter, to encourage media coverage of the Union's upcoming public rallies and to raise attention to the wage and staffing concerns within CFR.

37.     On May 28, 2025, at approximately 2:00 PM, the Union held its first public rally in support of its wage initiative in a Kroger parking lot on Madison Street. Plaintiffs Birkes, Collins, and Pasco attended the rally, which was covered by local news media. During the rally, Birkes manned the Union's kiosk and both Birkes and Collins were recorded by reporters. Clips of their attendance aired on the news. During the rally, Plaintiff Pasco was photographed wearing a pro-union shirt bearing the message "Don't Burn Your Fire Fighters." That photograph was subsequently posted on Facebook.

38.     While the May 28, 2025 rally was underway, a CFR administrative vehicle operated by Deputy Chief Jim Eley ("Deputy Chief Eley") drove through the parking lot observing the gathering.

39.     During the May 28, 2025 rally, CFR fire fighters on Shift A, including Plaintiff Musumeci, were on duty. During their shift, Battalion Chief Scott Owens, Battalion Chief Finch, and other members of leadership conveyed directives from Chief Montgomery to the fire fighters. Specifically, fire fighters were instructed not to visit Kroger or anywhere near it for lunch, despite it being their usual lunch destination. They were further warned that appearing at the rally in uniform or wearing any departmental gear was strictly prohibited and that any fire fighter who did

so would be immediately terminated.

40. On May 29, 2025, Plaintiffs Birkes, Stevens, Collins, and Musumeci attended an Emergency Medical Responder course taught by Captain Chandler. During the class, Plaintiffs discussed the Union's wage initiative and referenced the Clarksville Connect Facebook page. Captain Chandler overheard the conversation and interjected, again advising the Plaintiffs to stay away from the Union.

41. On May 29, 2025, at approximately 7:00 PM, the Union hosted a public event at Golly G's Ice Cream, located at 2622 Madison Street in Clarksville, Tennessee to promote their wage campaign. Plaintiff Musumeci attended the event, which was covered by local news outlets.

42. In May 2025, Councilperson Jerry Haywood ("Councilperson Haywood") visited Clarksville Fire Station 1 and Fire Station 3 to meet with fire fighters and discuss their concerns regarding CFR's operations.

43. While at Fire Station 3, Councilperson Haywood met Plaintiff Musumeci. During their conversation, Plaintiff Musumeci described the working conditions faced by CFR fire fighters, including concerns about the poor condition and lack of upkeep at CFR fire stations, and he asked for Councilperson Haywood's support for the Union's wage increase initiative.

44. Plaintiff Stevens also spoke with Councilperson Haywood during his visit to Fire Station 3. During their conversation, Plaintiff Stevens described the working conditions faced by CFR fire fighters, including issues such as mold on the ceilings, broken toilets, and the general lack of upkeep at CFR fire stations. Plaintiff Stevens also raised concerns about low pay, noting that CFR's wages were significantly less than those of neighboring fire departments, emphasized the need for a defined pay structure, and informed Councilperson Haywood that the Union had circulated a petition.

12

45. On May 31, 2025, Plaintiff Birkes posted "We are being heard keep it clean and keep up the good fight. Keep presenting the facts being honest and respectful and we can achieve our goal of a livable wage" on the public Clarksville Connect Facebook page.

46. In June 2025, Councilperson Keri Lovato ("Councilperson Lovato") visited Clarksville Fire Station 5 and Station 12 to meet with fire fighters and discuss compensation concerns. During her visit to Station 5, Councilperson Lovato, who works closely with Chief Montgomery, urged Plaintiff Birkes to discuss his concerns with Chief Montgomery.

47. On June 4, 2025, Union President Snyder held a press conference at the Union's headquarters to announce and discuss the Union's initiative. News reporters attended and recorded the event. Plaintiffs Birkes and Musumeci were present at the press conference and were captured in news recordings.

48. On June 12, 2025, Union President Snyder held a second press conference, this time outside City Hall to further address the Union's initiative. News reporters again covered the event, during which the Union publicly displayed the petition signatures printed on a scroll-style document.

49. Union President Snyder also briefly displayed a printed copy of the petition containing all collected signatures, while addressing Councilmembers during a City Council meeting.

50. On June 12, 2025, District Chief Troy Shepherd, while off duty, responded via text message to a City Councilperson's inquiry regarding overtime practices within CFR. On June 14, 2025, District Chief Shepherd was disciplined for communicating directly with a City Councilperson rather than utilizing the chain of command for operational, procedural, or policy inquiries.

51.     In mid-June, the Union held another press conference at the Union's headquarters. Plaintiffs Birkes and Musumeci were present at the press conference and were captured in news recordings.

52.     On June 23, 2025, the Union held a joint meeting with the Tennessee Professional Fire Fighters Association, the Tennessee state labor organization affiliated with the International Association of Fire Fighters ("IAFF"), the International labor union with which Local 3180 is also affiliated, at Old Glory Distilling Co. to discuss its fair pay initiative. Plaintiffs Birkes and Stevens attended the meeting.   Upon information and belief, Defendants were aware of Birkes' and Stevens' attendance at the meeting.

53.     On June 24, 2025, during a City Council meeting, supporters of the Union's wage initiative addressed the Council and expressed concerns regarding fire fighter pay and retention. Plaintiff Birkes went to City Hall in support of the Union's initiative. After the meeting, Birkes posed for a photograph with other Union supporters. Chief Montgomery, Deputy Chief Eley, and Deputy Chief Jobe Moore, who attended the City Council meeting, walked by and observed Plaintiff Birkes and shook their heads at him in disapproval.

54.     On or about June 24, 2025, Plaintiff Musumeci joined the Union. Upon information and belief, Defendants were aware that Musumeci joined the Union. Shortly thereafter, he received warnings from multiple individuals within CFR, including from his Lieutenant, Tyler Zilowski ("Lieutenant Zilowski"), who stated he was "worried about [him]."

55.     In June 2025, District Chief Christopher Parker warned Plaintiff Birkes that CFR leadership believed Plaintiff Birkes was responsible for the Union's initiative for fair wages.

56.     The Union's campaign for fair wages rapidly gained momentum, attracting widespread attention. The campaign drew coverage from local media outlets as well as major

14

platforms such as Fox News and Yahoo News. As a direct result of the Union's efforts, its membership surged by nearly 50%, increasing from approximately 80 members at the start of the campaign to around 123 members by July 2025.

57. In late June 2025, Chief Montgomery observed Plaintiff Birkes' wife at a Lowe's in Clarksville wearing a pro-union t-shirt.

58. On July 7, 2025, Lieutenant Matt Bennett submitted a letter of recommendation for Plaintiff Birkes, praising his dedication, professionalism, strong work ethic, and describing him as a valuable asset with exceptional fire fighting skills and a clear commitment to public safety.

59. On July 8, 2025, while on duty, Plaintiffs Birkes and Collins were directed to report to Fire Station 1. Upon arrival, they were met by their Battalion Chief, Michael Welch, Chief Montgomery, Deputy Chief Eley, and Deputy Chief Jobe Moore. Before any discussion, Plaintiff Birkes requested the presence of a Union representative. His request was denied.

60. Chief Montgomery then presented Plaintiffs Birkes and Collins each with a termination notice and instructed them to direct any questions to Deputy Chief Eley or Deputy Chief Moore. When Plaintiff Birkes asked for the reason for the termination, Deputy Chief Eley stated that no reason was required. Battalion Chief Welch indicated he had been unaware of the decision to terminate Birkes and Collins prior to the July 8, 2025 meeting. It was unusual for a CFR first line supervisor not to be aware of the grounds for termination of employees under their command.

61. The termination notices delivered to Plaintiffs Birkes and Collins were identical. Each notice stated simply, "This letter is to notify you that you are terminated from your position of firefighter with Clarksville Fire Rescue, effective immediately July 8, 2025. Pursuant to City Code Chapter 5, § 1.5-502, Probationary Period (d)." Each notice bore the signature of Chief

Montgomery.

62.     At the time of his termination, Plaintiff Birkes was within weeks of completing his probationary period. He had completed all required training, received a positive performance evaluation, and had never been issued a written reprimand or any other discipline.

63.     Plaintiff Birkes' termination occurred shortly after his highly visible participation in the Union's public outreach campaign in support of fair pay to improve retention and recruitment. Plaintiff Birkes attended nearly all public events, and Union meetings. He played a key role in launching the campaign's public outreach including utilizing his connections to secure coverage by Clarksville Connect. He appeared in local news coverage and was widely recognized in the community as a proponent of the Union's efforts. In further support of the campaign, Plaintiff Birkes ordered and distributed Union t-shirts and stickers at rallies, posted supportive messages on social media, signed the Union's petition, circulated the petition for signatures, discussed the campaign's progress with fellow fire fighters, including with Captain Chandler, and wore a Union shirt at rallies and in photographs posted on social media bearing the slogan "Don't Burn Your Fire Fighters," all of which were known and observed by the City and CFR officials.

64.     On July 26, 2025, Battalion Chief Welch submitted a letter of recommendation on behalf of Plaintiff Birkes.

65.     At the time of her termination, Plaintiff Collins was on track to complete all probationary requirements. She had successfully met performance expectations and received a positive evaluation.

66.     Plaintiff Collins was viewed in a high regard among CFR leadership. In the months preceding her termination, she was asked to participate in a recruit interview panel for incoming fire fighter applicants.

16

67. Plaintiff Collins' termination occurred shortly after her visible participation in the Union's campaign for fair pay to improve retention and recruitment. Collins attended a Union meeting, attended a public rally, and was featured in local news coverage of a demonstration. She visibly supported the campaign by wearing a Union shirt at the rally, carrying a laptop with a sticker reading "Support Your Local Fire Fighters" in full view of CFR officials, signing the Union's petition, circulating the petition for signatures, and participated in a conversation regarding the Union's campaign with fellow fire fighters, including with Captain Chandler. Additionally, Collins posted messages in support of the Union's initiative on her personal social media account. All of these activities were known and observed by the City and CFR officials.

68. Also on July 8, 2025, while on duty, Plaintiff Stevens was directed to report to Fire Station 1. Upon arrival, he was met by Battalion Chief Owens, Chief Montgomery, Deputy Chief Eley, and Deputy Chief Moore. Chief Montgomery presented Plaintiff Stevens with a termination notice. When Plaintiff Stevens asked what he had done wrong, Deputy Chief Eley responded with an "it is what it is," and instructed him to review the termination notice.

69. Plaintiff Stevens' termination notice was identical to those issued to Plaintiff Birkes and Collins and was also signed by Chief Montgomery.

70. Battalion Chief Owens stated he had no prior knowledge of Plaintiff Stevens' termination and stated that he would not have recommended Stevens for termination if it were up to him.

71. At the time of his termination, Plaintiff Stevens was within weeks of completing his probationary period. He had completed all required training, received a positive performance evaluation, and had never been issued a written reprimand.

72. Plaintiff Stevens' termination occurred shortly after his involvement in the Union's

17

campaign for fair pay to improve retention and recruitment. Stevens attended a Union recruitment meeting, signed the Union's petition in support of the campaign, circulated the petition for signatures, and discussed the campaign's progress with fellow fire fighters, including with Captain Chandler. Through his secondary employment, Stevens maintained a connection with Jurnee Gillette, the administrator of Clarksville Connect, further linking him to the Union's public outreach efforts in its campaign. All of these activities were known and observed by the City and CFR officials.

73.     On July 12, 2025, District Chief Travis Merchant submitted a letter of recommendation for Plaintiff Collins, noting her certifications, reliability, work ethic, integrity, and describing her as a dedicated and highly capable fire fighter.

74.     Between July 15-16, 2025, Battalion Chief Welch and Lieutenant Ben Workman submitted letters of recommendation for Plaintiff Collins.

75.     On July 16, 2025, Captain Andy Butler submitted a letter of recommendation for Plaintiff Stevens, commending his professionalism, dedication, strong commitment to public safety, proactive pursuit of advanced fire service training, and dependability, stating he would be an asset to any emergency services organization.

76.     In July 2025, Battalion Chief Owens, Fire Fighter Brandon Watts, Fire Fighter Chris Dewberry, and Fire Fighter Chayse Shepherd ("Fire Fighter Shepherd") submitted letters of recommendation for Plaintiff Stevens.

77.     On July 8, 2025, Plaintiff Musumeci was not on duty, because he was on vacation leave. Plaintiff Musumeci returned to work on July 18, 2025. While on vacation, Plaintiff Musumeci received calls from Fire Fighter Shepherd, Fire Fighter Eric Hanna, and Lieutenant Zilowski, each informing him that they had heard he was going to be terminated because of his

18

union activity.

78. On July 25, 2025, while on duty, Plaintiff Musumeci was directed to Fire Station 1. Upon arrival, he was met by Battalion Chief Owens, Captain Tim Joyner, Chief Montgomery, and Deputy Chief Eley. Chief Montgomery presented him with a written termination notice and instructed him to direct any questions to the other officers present.

79. The termination notice issued to Plaintiff Musumeci was identical to those previously given to Plaintiffs Birkes, Collins, and Stevens and was similarly signed by Chief Montgomery.

80. After Plaintiff Musumeci's termination, Battalion Chief Owens stated that he had no prior knowledge of the decision to terminate Plaintiff Musumeci and that he did not support the termination. He made this statement in the presence of Captain Joyner, who likewise did not support the decision to terminate Plaintiff Musumeci.

81. At the time of his termination, Plaintiff Musumeci was within weeks of completing his probationary period. He had successfully completed all required training, received a positive performance evaluation, and had never been issued any written reprimand or disciplinary action.

82. Plaintiff Musumeci's termination occurred shortly after his active participation in the Union's campaign for fair pay to improve retention and recruitment. Plaintiff Musumeci attended public events and Union meetings, became a Union member, discussed the campaign's progress with fellow fire fighters, including with Captain Chandler, signed the Union's petition, and circulated the petition for signatures. He was featured in local news footage of a Union event and shared the video on his personal social media account. Plaintiff Musumeci also visibly supported the campaign by wearing a Union shirt bearing the message "Don't Burn Your Fire Fighters" in full view of City and CFR officials. All of these activities were known and observed

19

by the City and CFR officials.

83. On August 17, 2025, Battalion Chief Owens submitted a letter of recommendation for Plaintiff Musumeci, praising his strong work ethic, multiple fire service certifications, reliability as a team member, and describing him as one of the best fire fighters ever assigned to his Lieutenant's station.

84. Between August 17-18, 2025, Lieutenant Tyler Zilowski and District Chief Thomas Ford submitted letters of recommendation for Plaintiff Musumeci.

85. On July 8, 2025, Plaintiff Pasco was not on duty, because she was on intermittent FMLA leave. Plaintiff Pasco returned to work on July 19, 2025. During her leave, Plaintiff Pasco received calls from Training Captain Steve Peters, Lieutenant Jason Carlisle, and Lieutenant Tyler Zilowski, all warning her that she was going to be terminated for her union activity.

86. On July 16, 2025, Squad Captain Sharrock Cobb sent Plaintiff Pasco a text message advising her to remove a social media post related to the Union's efforts and warning, "Don't poke the bear."

87. On or about July 23, 2025, Lieutenant Josh Newcomb informed Plaintiff Pasco that she and Plaintiff Musumeci were "next on the fire list."

88. On July 25, 2025, while on duty, Plaintiff Pasco was directed to report to Fire Station 1. Upon arrival, she was met by Battalion Chief Finch, Battalion Chief Owens, Chief Montgomery, and Deputy Chief Eley. Chief Montgomery presented Plaintiff Pasco with her termination notice. When Plaintiff Pasco received her termination notice, she began crying and asked what the reason was. In response, Chief Montgomery laughed.

89. Plaintiff Pasco's termination notice was identical to those issued to Plaintiff Birkes, Collins, Stevens, and Musumeci. The notice included no reason for the termination and was signed

20

by Chief Montgomery.

90. On July 26, 2025, at approximately 10:16AM, Battalion Chief Finch called Plaintiff Pasco and stated he had no prior knowledge of Plaintiff Pasco's termination.

91. On July 26, 2025, at approximately 1:27 PM, Plaintiff Pasco's District Chief, Josh Snyder, called Plaintiff and stated that he had no prior knowledge of her termination and remarked that he wished he could have advised her against attending the Union rallies.

92. At the time of her termination, Plaintiff Pasco was within weeks of completing her probationary period. She had successfully completed all required training, received an exceptional performance evaluation—the second highest in her recruit class—and had never been issued a written reprimand or discipline.

93. Plaintiff Pasco's termination occurred shortly after her active and visible participation in the Union's campaign for fair pay to improve retention and recruitment. Plaintiff Pasco was a member of the Union, attended Union meetings and rallies in support of the Union's initiative, created and signed the Union petition, circulated the petition for signatures, discussed the campaign's progress with fellow fire fighters, and wore a Union t-shirt with the slogan "Don't Burn Your Fire Fighters" in full view of City and CFR officials. A photo of her wearing this shirt appeared on Facebook, and she posted on social media in support of the Union's initiative. All of these activities were known and observed by the City and CFR officials.

94. In August 2025, District Chief Josh Snyder submitted a letter of recommendation for Plaintiff Pasco, praising her professionalism, calm performance under pressure, strong work ethic, compassion, and positive influence on peers, stating she would be an exceptional asset to any organization.

95. In August 2025, Battalion Chief Finch, Lieutenant Marcus Griffy, Engineer Willie

Bailey, and Stewart County Fire Rescue Chief Ethan Luffman submitted letters of recommendation for Plaintiff Pasco.

96. Despite Plaintiffs receiving positive performance evaluations and despite CFR being critically understaffed, Defendants terminated Plaintiffs' employment for no stated reason. In stark contrast, other members of the same recruit class, including individuals with lower evaluation scores, remained employed. Notably, none of those probationary fire fighters who remained employed were members of the Union or had engaged in any union-related activities.

97. Plaintiffs were terminated shortly after engaging in highly visible public advocacy and union related speech on matters of public concern, including public advocacy regarding fire fighter pay as it relates to staffing, retention, and public safety; communications with elected City Councilmembers; participation in public rallies and press conferences; attending Union meetings; public petitioning activity; and public facing advocacy on social media. Defendants' terminations were carried out pursuant to the City's longstanding custom of discouraging union related advocacy.

98. Defendants' actions in terminating the Plaintiffs were motivated by protected First Amendment activity and communications to elected officials rather than legitimate considerations.

99. Defendant Chief Montgomery had final policymaking authority for Clarksville Fire Rescue with respect to personnel decisions and policies, including the authority to discipline and recommend termination of probationary firefighters, CFR's employment policies on prohibited conduct by its employees, and CFR's policies on probationary firefighters' First Amendment activities and communications to elected officials. Chief Montgomery exercised this authority in terminating Plaintiffs because of their union affiliation and First Amendment protected activities.

100. It was the official City's policy to discourage union activity and association with

22

the Union among its employees at CFR and to punish and retaliate against City employees at CFR who engage in union activity or associated with IAFF Local 3180.

101. For years, CFR maintained a widespread and well-settled custom of discouraging union membership and retaliating against union-affiliated fire fighters. This custom was evidenced by repeated anti-union statements by department leadership.

102. The retaliation against Plaintiffs continued even after their terminations.

103. Plaintiff Collins, who is now employed as a Fire Fighter with Dickson Fire Rescue in Dickson, Tennessee, reached out to Brent Ham, the Dickson Fire Rescue Training Captain, requesting to attend a training hosted by Clarksville Fire Rescue on November 21, 2025.

104. Although CFR's November 21, 2025, training was open to fire fighters from neighboring fire departments, Captain Hamm informed Plaintiff Collins that CFR's training department had stated that Collins was not welcome to attend any CFR trainings. As a result, Collins was prevented by CFR from receiving the training.

105. Similarly, in November 2025, Plaintiff Birkes, who is currently employed as an EMR Fire Fighter for Montgomery County Fire Rescue, requested to attend the same training event.

106. On November 7, 2025, Logan Face, the Montgomery County Fire Rescue Logistics Training Captain, emailed CFR's Assistant Training Chief Ellis a list of fire fighters scheduled to attend the CFR training event, including Birkes. In response, Assistant Chief Ellis stated that Birkes was "not welcome" because "he left on bad terms."

107. On November 10, 2025, Plaintiff Pasco, who is volunteering with Stewart County Fire Rescue, emailed Chief Ellis requesting to attend CFR's November 21, 2025 training. Assistant Chief Ellis replied claiming "the class is full now" and that he was "unable to open any more

23

seats."

108. Plaintiff Pasco later learned that, after emailing her that the class was "full," Assistant Chief Ellis continued recruiting additional attendees for the training and that seats remained available. A social media post depicting the event further confirmed that empty seats were available.

109. On November 21, 2025, CFR hosted a training event that was open to fire fighters from neighboring departments. Plaintiffs Collins, Birkes, and Pasco, all of whom had expressed interest in attending, were expressly prohibited from attending.

110. As a result of their unlawful termination and subsequent retaliatory acts—including being barred from professional training opportunities—Plaintiffs have suffered lost wages and benefits, emotional distress, reputational harm, and other damages.

111. On November 19, 2025, Defendant Chief Montgomery implemented Clarksville Fire Rescue Policies, Procedures, and Guidelines, Section 200, Subsections 217.01-217.02, entitled "Club and Organizational Membership." The policy requires personnel to obtain prior approval from the Fire Chief or their designee prior to affiliating with any organization. The policy further states that CFR personnel "shall not belong to any club, organization, association, and or society which … will, in any manner, reflect disservice, disrespect, or negativity toward Clarksville Fire Rescue or the City of Clarksville." The policy imposes restrictions that restrain or deny CFR employees' rights to freely join the Union and participate in protected First Amendment and union activities.

112. Plaintiffs demand a jury trial in this matter.

# COUNT I
## 42 U.S.C. § 1983 – VIOLATION OF PLAINTIFFS' FIRST AND FOURTEENTH AMENDMENT RIGHT TO FREE SPEECH
(Plaintiffs Birkes, Collins, Musumeci, Pasco, and Stevens v. All Defendants)

113. Plaintiff realleges and incorporates Paragraphs 1 through 111.

114. The right of the Plaintiffs to speak freely about matters of public concern is protected by the First Amendment and Fourteenth Amendment of the U.S. Constitution. The public has a vital interest in free and open discussion on issues of public importance.

115. It is a violation of the First Amendment and Fourteenth Amendment of the U.S. Constitution for public employers, including the City and Chief Montgomery, to discriminate against, discipline, or discharge its employees in retaliation for engaging in speech about matters of public concern as private citizens and not pursuant to their official duties.

116. Plaintiffs' speech addressed matters of public concern, including staffing shortages, retention and recruitment problems, fire fighter fatigue from second jobs, morale issues affecting operational readiness, and the resulting risks to fire fighter and public safety, as well as the City's allocation of public resources to ensure an effective fire department. Their advocacy was amplified by local media coverage and joined by many members of the community.

117. Plaintiffs engaged in speech as private citizens and outside their official duties, including at public rallies and events, in communications with elected officials, through public petition activity, and through public facing advocacy on social media.

118. Plaintiff Birkes, acting as a private citizen, engaged in free speech about matters of public concern to improve fire fighter compensation as a means of addressing understaffing and retention and recruitment problems that undermined public safety, including, but not limited to, advocating for fair pay for CFR fire fighters, attending and participating in public rallies in support of the Union's initiative, attending and participating in Union meetings, attending a press

25

conference regarding the Union's campaign, wearing the Union t-shirt bearing the slogan "Don't Burn Your Fire Fighters," posing for a photograph with Union supporters in pro-union apparel, distributing Union t-shirts and stickers, signing the Union's petition in support of the campaign, circulating the petition for additional signatures, posting on social media in support of the Union's initiative, appearing in media coverage as a Union supporter, emailing members of City Council regarding concerns about fire fighter pay and retention in support of the Union's campaign for fair wages, meeting with Councilperson Lovato to discuss concerns about the Union's campaign, and discussing the Union's initiative with fellow fire fighters and community members, all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

119. Plaintiff Collins, acting as a private citizen, engaged in free speech about matters of public concern to improve fire fighter compensation as a means of addressing understaffing and retention and recruitment problems that undermined public safety, including, but not limited to, advocating for fair pay for CFR fire fighters, attending a rally in support of the Union's initiative, posting about the Union's initiative on social media, wearing a Union t-shirt bearing the slogan "Don't Burn Your Fire Fighters," displaying a Union sticker on her laptop as symbolic expression of support, appearing in media coverage as a Union supporter, signing the Union's petition in support of the campaign, circulating the petition for additional signatures, and discussing the Union with fellow fire fighters and community members, all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

120. Plaintiff Musumeci, acting as a private citizen, engaged in free speech about matters of public concern to improve fire fighter compensation as a means of addressing understaffing and retention and recruitment problems that undermined public safety, including, but not limited to, advocating for fair pay for CFR fire fighters, attending a rally in support of the Union's initiative,

26

attending Union meetings, attending a press conference regarding the Union's campaign, speaking with Councilperson Haywood about fire station conditions and the Union's campaign for fair wages, posting about the Union's initiative on social media, wearing the Union t-shirt bearing the slogan "Don't Burn Your Fire Fighters," appearing in media coverage as a Union supporter, signing the Union's petition in support of the campaign, circulating the petition for additional signatures, and discussing the Union's initiative with fellow fire fighters and community members, all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

121. Plaintiff Pasco, acting as a private citizen, engaged in free speech about matters of public concern to improve fire fighter compensation as a means of addressing understaffing and retention and recruitment problems that undermined public safety, including, but not limited to, advocating for fair pay for CFR fire fighters, attending rallies in support of the Union's initiative, posting about the Union's initiative on social media, wearing the Union t-shirt bearing the slogan "Don't Burn Your Fire Fighters," appearing in a publicly shared photograph wearing pro-Union apparel, appearing in media coverage as a Union supporter, creating the petition in support of the Union's campaign, signing the petition, circulating the petition for additional signatures, and discussing the Union's initiative with fellow fire fighters and community members, all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

122. Plaintiff Stevens, acting as a private citizen, engaged in free speech about matters of public concern to improve fire fighter compensation as a means of addressing understaffing and retention and recruitment problems that undermined public safety including, but not limited to, attending a Union meeting, signing the Union's petition in support of the campaign, circulating the petition for additional signatures, speaking with Councilperson Haywood about fire station conditions and concerns about the Union's campaign for fair wages, and discussing the Union's

27

fair pay campaign and its progress with fellow fire fighters, all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

123. Defendants knew of Plaintiffs' protected speech through personal observation of Plaintiffs at rallies and public events; monitoring social media posts and media coverage of the Union's campaign; and knowledge of petition activity and communications with City Councilmembers.

124. Defendants, acting individually and/or jointly, retaliated against, discriminated against, and terminated Plaintiffs because Plaintiffs engaged in free speech about matters of public concern to improve fire fighter compensation as a means of addressing understaffing and retention and recruitment problems that undermined public safety including, but not limited to, attending public rallies and events in support of the Union's initiative, attending Union meetings, circulating the Union's petition for additional signatures, speaking with and writing to Councilmembers, posting on social media, and wearing pro-Union apparel. The close temporal proximity between Plaintiffs' public speech and their terminations, Plaintiffs' strong performance evaluations, the selective termination of only union affiliated probationary fire fighters, and the long history of anti-union statements by CFR leadership demonstrate a retaliatory motive.

125. Defendants' conduct unlawfully chills free and open discussion on important issues of public safety and the effective and efficient operation of the government, including the City's fire department in its public safety functions and the use of taxpayer funds, and it intimidates, coerces, and restrains other public employees and persons from similarly engaging in protected speech.

126. The retaliation against and discharge of Plaintiffs was initiated and enforced pursuant to express and official policies of CFR. Further, Defendant Chief Montgomery, who

28

directed and implemented these actions on behalf of the City, had final policymaking authority over personnel decisions and the administration of the CFR. These retaliatory actions were taken because Plaintiffs engaged in protected speech under the First and Fourteenth Amendments.

127. Defendants' retaliatory conduct reflected a longstanding and widespread custom within CFR of discouraging union involvement and punishing fire fighters who engaged in speech on matters of public concern. For years, CFR leadership at multiple ranks, including the Fire Chief, Deputy Chiefs, District and Battalion Chiefs, Captains, Lieutenants, and Training Officers, routinely expressed hostility toward the Union, and warned against adverse consequences for engaging in protected union related speech. This widespread custom was reinforced through repeated statements, warnings, and adverse treatment of those who publicly supported the Union.

128. Such conduct by Defendants was done in a knowing, willful, wanton, reckless, and bad faith manner, which violates clearly established constitutional provisions and rights which a reasonable person would have known.

129. As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiffs suffered, and continue to suffer, economic injury, mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, and other injuries and irreparable harm.

130. Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Thus, Defendants City and Chief Montgomery are liable to Plaintiffs for their injuries resulting from Defendants retaliating against them and terminating them in violation

29

of the First and Fourteenth Amendments.

131.     Defendants are also liable for Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

<u>**COUNT II**</u>
**42 U.S.C. § 1983 – VIOLATION OF PLAINTIFFS' FIRST AND FOURTEENTH AMENDMENT RIGHT TO FREE ASSOCIATION**
(Plaintiffs Birkes, Collins, Musumeci, Pasco, and Stevens v. All Defendants)

132.      Plaintiffs reallege and incorporate Paragraphs 1 through 111.

133.     The right of Plaintiffs to freely associate with a labor organization such as Local 3180 is protected by the First and Fourteenth Amendments of the U.S. Constitution. Specifically, the First and Fourteenth Amendments protect the right of a public employee to associate with a union, as it is the right of a public employee to advocate for matters of public concern through his or her union.  The public has a vital interest in such free association.

134.     It is a violation of the First and Fourteenth Amendments of the U.S. Constitution for public employers, including the City, to discriminate against, discipline, or discharge employees for exercising such rights to free association, including the right to freely associate with a labor union or advocate for matters of public concern through his or her union.

135.     Plaintiffs' associational activity addressed matters of public concern, including ongoing staffing shortages, fire fighter fatigue from having to work second jobs, deteriorating station conditions, retention, recruitment and turnover problems affecting operational readiness, and the resulting risks to fire fighter and public safety.

136.     At all relevant times, Plaintiff Birkes was a member of, actively participated in, and supported the Union. As a member and supporter of Local 3180, Plaintiff Birkes attended and participated in Union meetings, attended a press conference regarding the Union's campaign, assisted in circulating information about the Union's wage campaign, ordered and distributed

30

Union t-shirts and stickers, wore pro-Union clothing, signed a petition in support of the Union's campaign, circulated the petition for additional signatures, attended public rallies in support of the Union's initiative, appeared in media coverage as a Union supporter, posed for a photograph with Union supporters in pro-union apparel, and engaged with City Councilmembers, all in furtherance of the Union's campaign on matters of public concern, and all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

137. At all relevant times, Plaintiff Collins actively supported the Union. As a supporter of Local 3180, Plaintiff Collins attended a union meeting, participated in a union-organized rally, signed a petition in support of the Union's campaign, circulated the petition for additional signatures, appeared in media coverage as a Union supporter, visibly supported the Union by wearing union apparel, and openly displayed a Union sticker on her laptop, all in furtherance of the Union's campaign on matters of public concern, and all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

138. At all relevant times, Plaintiff Musumeci was a member of, actively participated in, and supported the Union. As a member and supporter of Local 3180, Plaintiff Musumeci attended Union meetings, attended a public rally in support of the Union's initiative, communicated with Councilperson Haywood about fire station conditions and concerns about the Union's campaign, attended a press conference regarding the Union's campaign, signed a petition in support of the Union's campaign, circulated the petition for additional signatures, appeared in media coverage as a Union supporter, and wore pro-Union apparel, all in furtherance of the Union's campaign on matters of public concern, and all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

139. At all relevant times, Plaintiff Pasco was a member of, actively participated in, and

31

supported the Union. As a member and supporter of Local 3180, Plaintiff Pasco attended Union meetings, attended rallies in support of the Union's initiative, wore pro-Union apparel, was photographed wearing a pro-Union shirt that was subsequently posted on social media, created the petition in support of the Union's campaign, signed the petition, and circulated the petition for additional signatures, all in furtherance of the Union's campaign on matters of public concern, and all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

140. At all relevant times, Plaintiff Stevens supported the Union. As a supporter of Local 3180, Plaintiff Stevens attended a Union meeting, signed a petition in support of the Union's campaign, circulated the petition for additional signatures, and was publicly perceived to be associated with the Union's campaign through his connection to the Clarksville Connect Facebook Page, which played an important role in amplifying the Union's campaign, all in furtherance of the Union's campaign on matters of public concern, and all of which is protected by the First and Fourteenth Amendments of the U.S. Constitution.

141. At all relevant times, Defendants were aware of Plaintiffs' association with Local 3180 and Plaintiffs' activities on behalf of Local 3180.

142. Defendants, acting individually and/or jointly, retaliated against, discriminated against, and terminated Plaintiffs because of their association with Local 3180 and because they engaged in union activities on matters of public concern that are protected by the First and Fourteenth Amendments' right to free association.

143. The close temporal proximity between Plaintiffs' associational activity and their terminations, Plaintiffs' strong performance evaluations, the selective termination of only union affiliated probationary fire fighters, and the long history of anti-union statements by CFR leadership demonstrate a retaliatory motive.

32

144. Defendants' conduct unlawfully chills the free association rights of Plaintiffs and other CFR employees who are members of or might want to become members of Local 3180, and Defendants' conduct intimidates, coerces and restrains other CFR employees from similarly engaging in protected associational activities.

145. The retaliation, discrimination, and discharge of Plaintiffs were issued and initiated pursuant to express and/or official policies of the City. Further, Defendant Chief Montgomery, who directed and implemented the Plaintiffs' terminations on behalf of the City, had final policymaking authority over personnel decisions and the administration of the Fire Department. These retaliatory actions were taken because Plaintiffs engaged in protected associational activities.

146. Defendants' retaliatory conduct reflected a longstanding and widespread custom within CFR of discouraging union involvement and punishing fire fighters who engaged in associational conduct on matters of public concern. For years, CFR leadership at multiple ranks, including the Fire Chief, Deputy Chiefs, District and Battalion Chiefs, Captains, Lieutenants, and Training Officers, routinely expressed hostility toward the Union and warned of adverse consequences for engaging in protected union related activities. This widespread custom was reinforced through repeated statements, warnings, and adverse treatment of those who publicly supported the Union.

147. Such conduct by Defendants was done in a knowing, willful, wanton, reckless, and bad faith manner, which violates clearly established constitutional provisions and rights which a reasonable person would have known.

148. As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and continue to suffer, economic injury, mental and emotional distress,

33

humiliation, anxiety, embarrassment, and discomfort, and other injuries and irreparable harm.

149. Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Thus, Defendants City and Chief Montgomery are liable to Plaintiffs for their injuries resulting from Defendants retaliating against them and terminating them in violation of the First and Fourteenth Amendments.

150. Defendants are also liable for Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

## COUNT III
### 42 U.S.C. § 1983 – VIOLATION OF PLAINTIFFS' FIRST AND FOURTEENTH AMENDMENT RIGHT TO PETITION THE GOVERNMENT
(Plaintiffs Birkes, Collins, Musumeci, Pasco, and Stevens v. All Defendants)

151. Plaintiffs reallege and incorporate Paragraphs 1 through 111.

152. The right of Plaintiffs to petition their government for the redress of grievances is protected by the First and Fourteenth Amendments to the U.S. Constitution. The public has a vital interest in providing citizens with the opportunity to freely advocate for and seek change without fear of punishment or reprisal.

153. It is a violation of the First and Fourteenth Amendments for public employers, including the City, to discriminate against, discipline, or discharge its employees in retaliation for petitioning the government to redress grievances.

154. Plaintiffs' petitioning activity addressed matters of public concern, including wage concerns, ongoing staffing shortages, fire fighter fatigue from having to work second jobs,

34

deteriorating station conditions, retention, recruitment and turnover problems affecting operational readiness, and the resulting risks to fire fighter and public safety. Plaintiffs' petitioning occurred in the context of a broader campaign regarding the effective operation of CFR. Plaintiff Birkes petitioned the government to redress his and his co-workers' grievances by engaging in protected activity, including signing a petition addressed to City officials and emailing City Council members addressing matters of public concern including wage concerns, ongoing staffing shortages, retention, recruitment and turnover problems affecting operational readiness, and the resulting risks to fire fighter and public safety. These activities are protected by the First and Fourteenth Amendments of the U.S. Constitution.

155.    Plaintiff Collins petitioned the government to redress her and her co-workers' grievances by engaging in protected activity, including signing a petition addressed to City officials addressing matters of public concern including wage concerns, ongoing staffing shortages, retention, recruitment and turnover problems affecting operational readiness, and the resulting risks to fire fighter and public safety. This activity is protected by the First and Fourteenth Amendments of the U.S. Constitution.

156.    Plaintiff Musumeci petitioned the government to redress his and his co-workers' grievances by engaging in protected activity, including signing a petition addressed to City officials addressing matters of public concern including wage concerns, ongoing staffing shortages, retention, recruitment and turnover problems affecting operational readiness, and the resulting risks to fire fighter and public safety and communicating with Councilperson Haywood regarding the poor conditions of CFR fire stations and the Union's campaign for fair wages. These activities are protected by the First and Fourteenth Amendments of the U.S. Constitution.

157.    Plaintiff Pasco petitioned the government to redress her and her co-workers'

35

grievances by engaging in protected activity, including creating and circulating a petition addressed to City officials and signing that petition addressing matters of public concern including wage concerns, ongoing staffing shortages, retention, recruitment and turnover problems affecting operational readiness, and the resulting risks to fire fighter and public safety. This activity is protected by the First and Fourteenth Amendments of the U.S. Constitution.

158. Plaintiff Stevens petitioned the government to redress his and his co-workers' grievances by engaging in protected activity, including signing a petition addressed to City officials addressing matters of public concern including ongoing staffing shortages, retention, recruitment and turnover problems affecting operational readiness, and the resulting risks to fire fighter and public safety and communicating with Councilperson Haywood regarding the poor conditions of CFR fire stations and the Union's campaign for fair wages. These activities are protected by the First and Fourteenth Amendments of the U.S. Constitution.

159. Defendants, acting individually and/or jointly, retaliated against, discriminated against, and terminated Plaintiffs because of their activities in petitioning the government to redress their and their co-workers' grievances. The close temporal proximity between Plaintiffs' public speech and their terminations, Plaintiffs' strong performance evaluations, the selective termination of only union affiliated probationary fire fighters, and the long history of anti-union statements by CFR leadership demonstrate a retaliatory motive. In doing so, Defendants retaliated against, discriminated against, and terminated Plaintiffs in retaliation for engaging in protected petitioning activity in violation of the First and Fourteenth Amendments to the U.S. Constitution.

160. Defendants' conduct unlawfully chills the right to freely petition the government to redress grievances and intimidates, coerces, and restrains other public employees and persons from similarly exercising their rights under the First and Fourteenth Amendments to petition the

36

government to redress grievances.

161. The retaliation, discrimination, and termination of Plaintiffs were issued and initiated pursuant to express and/or official policies of the City. Further, Defendant Chief Montgomery, who directed and implemented Plaintiffs' terminations on behalf of the City, had final policymaking authority over personnel decisions and the administration of the Fire Department. These retaliatory actions were taken because Plaintiffs exercised their rights to petition the government to redress their and their co-workers' grievances.

162. Defendants' retaliatory conduct reflected a longstanding and widespread custom within CFR of discouraging union involvement and punishing fire fighters who engaged in petitioning regarding matters of public concern. For years, CFR leadership at multiple ranks, including the Fire Chief, Deputy Chiefs, District and Battalion Chiefs, Captains, Lieutenants, and Training Officers, routinely expressed hostility toward the Union, and warned against adverse consequences for engaging in protected union related activity. This widespread custom was reinforced through repeated statements, warnings, and adverse treatment of those who publicly supported the Union.

163. Such conduct by Defendants was done in a knowing, willful, wanton, reckless, and bad faith manner, which violates clearly established constitutional provisions and rights which a reasonable person would have known.

164. As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and continue to suffer, economic injury, mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, and other injuries and irreparable harm.

165. Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or

37

causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Thus, Defendants City and Chief Montgomery are liable to Plaintiffs for injuries resulting from Defendants retaliating against them and terminating them in violation of the First and Fourteenth Amendments.

166. Defendants are also liable for Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

**COUNT IV**
**42 U.S.C. § 1983 – VIOLATION OF THE FOURTEENTH AMENDMENT EQUAL PROTECTION**
(Plaintiffs Birkes, Collins, Musumeci, Pasco, and Stevens v. All Defendants)

167. Plaintiffs reallege and incorporate Paragraphs 1 through 111.

168. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees that no State shall deny any person within its jurisdiction the equal protection of the laws.

169. Public employers, including the City, violate the Equal Protection Clause when they intentionally treat employees differently from others similarly situated without a rational basis or for an impermissible reason, including retaliation for exercising constitutional rights.

170. At all relevant times, Plaintiffs were similarly situated to other probationary employees in their recruit classes in terms of job duties, qualifications, and performance.

171. Defendants intentionally treated Plaintiffs differently from other similarly situated employees by retaliating against, discriminating against, and terminating Plaintiffs because they exercised their constitutional rights to free speech, free association, and petition, and because of their affiliation with and support for Local 3180 and Local 3180's campaign for improved wages

38

to address chronic understaffing and recruitment and retention problems throughout CFR.

172. Defendants' actions were motivated by animus towards Plaintiffs' union affiliation and protected activities and lacked any legitimate governmental purpose or rational basis.

173. Defendants' conduct unlawfully chills the exercise of constitutional rights and intimidates, coerces, and restrains other public employees from engaging in similar protected activities.

174. The retaliation, discrimination, and termination of Plaintiffs were initiated and enforced pursuant to express and/or official policies of the City. Further, Defendant Chief Montgomery, who directed and implemented Plaintiffs' terminations on behalf of the City, had final policymaking authority over personnel decisions and the administration of the Fire Department.

175. Defendants' retaliatory conduct reflected a longstanding and widespread custom within CFR of discouraging union involvement and punishing fire fighters who engaged in speech on matters of public concern. For years, CFR leadership at multiple ranks, including the Fire Chief, Deputy Chiefs, District and Battalion Chiefs, Captains, Lieutenants, and Training Officers, routinely expressed hostility toward the Union, and warned against adverse consequences for engaging in protected union related speech. This widespread custom was reinforced through repeated statements, warnings, and adverse treatment of those who publicly supported the Union.

176. Such conduct by Defendants was done in a knowing, willful, wanton, reckless, and bad faith manner, which violates clearly established constitutional provisions and rights which a reasonable person would have known.

177. As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer economic injury, mental and emotional distress,

39

humiliation, anxiety, embarrassment, and discomfort, and other injuries and irreparable harm.

178. Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Thus, Defendants City and Chief Montgomery are liable to Plaintiffs for injuries resulting from Defendants retaliating against them and terminating them in violation of the Equal Protection Clause of the Fourteenth Amendment.

179. Defendants are also liable for Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

**<u>COUNT V</u>**
**42 U.S.C. § 1983 – VIOLATION OF IAFF LOCAL 3180'S FIRST AND FOURTEENTH AMENDMENT RIGHT TO FREE ASSOCIATION**
(Plaintiff IAFF Local 3180 v. All Defendants)

180. Plaintiff IAFF Local 3180 realleges and incorporates Paragraphs 1 through 111.

181. IAFF Local 3180 has an independent First Amendment right of expressive association, including the right to organize, recruit, meet, and advocate on behalf of fire fighters. These protections apply to state and local governments through the Fourteenth Amendment.

182. On November 19, 2025, Defendant Chief Montgomery implemented and enforced newly revised policy requiring personnel to obtain prior approval from the Fire Chief or designee before affiliating with any organization and prohibiting affiliation that may "reflect . . . disrespect[] or negativity" toward the Department or City. This policy targets and burdens union affiliation and participation, and the rights of fire fighters to join, support, and participate in IAFF Local 3180. He also communicated the policy to all members of CFR the same day.

40

183. By enacting Policy 217.01-217.02, Defendants intentionally interfered with IAFF Local 3180's ability to freely associate with its members and carry out its representational functions, including organizing meetings, recruiting members, and advocating for improved wages and working conditions.

184. Defendants' conduct unlawfully chills the associational rights of IAFF Local 3180 and intimidates, coerces, and restrains other public employees from engaging in their constitutionally protected associational rights and other protected Union activities.

185. The enactment and enforcement of Policy 217.01-217.02 was initiated and implemented by Chief Montgomery, who exercised final policymaking authority for the City with respect to CFR personnel decisions and the administration of the Fire Department. Policy 217.01-217.02, initiated and implemented by Chief Montgomery, became official policy of the City.

186. Such conduct by Defendants was done in a knowing, willful, wanton, reckless, and bad faith manner, which violates clearly established constitutional provisions and rights which a reasonable person would have known.

187. As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, IAFF Local 3180 has suffered, and continues to suffer, harm to its ability to represent members, loss of membership participation, reputational injury, and other irreparable harm.

188. Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Thus, Defendants City and Chief Montgomery are liable to IAFF Local

41

3180 for injuries resulting from Defendants' interference with and retaliation against its protected associational rights.

189.    Defendants are also liable for IAFF Local 3180's reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

190.    IAFF Local 3180 seeks a declaratory judgment that Policy 217.01-217.02 is unconstitutional both on its face and as applied to the Union's associational activities, a permanent injunction restraining its enforcement, and nominal and compensatory damages for the organizational harm caused by Defendants' conduct.

## COUNT VI
### 42 U.S.C. § 1983 – VIOLATION OF IAFF LOCAL 3180'S FIRST AND FOURTEENTH AMENDMENT RIGHT TO FREE ASSOCIATION ON BEHALF OF ITS MEMBERS
(Plaintiff IAFF Local 3180 v. All Defendants)

191.    Plaintiff IAFF Local 3180 realleges and incorporates Paragraphs 1 through 111.

192.    IAFF members' right to freely associate with a labor organization and to participate in union activity is protected by the First and Fourteenth Amendments of the United States Constitution. The public has a vital interest in workers' ability to organize and advocate collectively on matters of public importance, including public safety and department operational matters without fear of reprisal.

193.    It is a violation of the First and Fourteenth Amendments of the United States Constitution for public employers, including Defendants, to discriminate against, restrain, or discipline employees in retaliation for associating with, joining, supporting, or participating in a labor organization and related union activity, including off duty participation and advocacy on matters of public concern. On November 19, 2025, Defendant Chief Montgomery implemented, circulated, and enforced a newly revised policy requiring personnel to obtain prior approval from the Fire Chief or designee before affiliating with any organization and prohibiting affiliation that

42

may "reflect . . . disrespect[] or negativity" toward the Department or City. This policy targets and burdens union affiliation and participation, and the rights of fire fighters to join, support, and participate in IAFF Local 3180 are protected by the First and Fourteenth Amendments.

194. By enacting and circulating Policy 217.01-217.02 to the entire CFR, Defendants intentionally interfered with the ability of members and potential members of IAFF Local 3180 to freely associate with each other and their Union by deterring and restricting members from joining, participating in, and engaging in protected associational conduct, including engaging in collective advocacy on matters of public concern about CFR and undermining the Union's ability to function and represent its membership. Defendants' conduct has chilled the exercise of members' associational rights protected by the First and Fourteenth Amendments. Defendants' conduct unlawfully chills IAFF Local 3180's ability to advocate for its members and intimidates, coerces, and restrains other public employees from engaging in protected associational conduct.

195. The enactment and enforcement of Policy 217.01-217.02 was initiated and implemented by Chief Montgomery, who had final policymaking authority over personnel decisions and the administration of the Fire Department. Policy 217.01-217.02, initiated and implemented by Chief Montgomery, became official policy of the City.

196. Such conduct by Defendants was done in a knowing, willful, wanton, reckless, and bad faith manner, which violates clearly established constitutional provisions and rights which a reasonable person would have known.

197. As a direct, foreseeable, and proximate result of Defendants' unlawful conduct, the members of IAFF Local 3180 have suffered, and continue to suffer, loss and deterrence of associational opportunities, loss of membership participation, suppression of participation in protected union activity, and other irreparable harm to their constitutional rights.

43

198. IAFF members would have standing to sue for this violation in their own right because Defendants' policy and conduct have chilled and deterred their First Amendment right to freely associate, including the right to join, support, and participate in associational activity without prior approval or fear of punishment.

199. As a labor union, protecting members' ability to associate with the Union and participate in union activities is central to IAFF Local 3180's purpose. Thus, IAFF Local 3180's interests in eliminating and redressing Defendants' conduct which harms members' First and Fourteenth Amendment associational rights are germane to those organizational purposes.

200. Defendants' policy and conduct infringe on IAFF Local 3180 members' associational rights in an identical manner, subjecting all members and prospective members to the same prior approval requirement and "disrespectful" or "negativity" prohibition. The claims seek declaratory and injunctive relief and do not require individual members' participation to adjudicate liability or remedy the constitutional violation.

201. Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Thus, Defendants City and Chief Montgomery are fully liable to IAFF Local 3180 for injuries resulting from Defendants' interference with and retaliation against its protected associational rights.

202. Defendants are also liable for IAFF Local 3180's reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

203. On behalf of its members, IAFF Local 3180 seeks a declaratory judgment that Policy 217.01-217.02 is unconstitutional both on its face and as applied to the Union's members' associational activities, a permanent injunction restraining its enforcement, and nominal and compensatory damages for the organizational harm caused by Defendants' conduct.

## COUNT VII
### PEPFA TENN. CODE ANN. § 8-50-603 ET SEQ. – RETALIATION UNDER PUBLIC EMPLOYEE POLITICAL FREEDOM ACT OF 1980
(Plaintiffs Birkes, Musumeci, and Stevens v. Defendant City)

204. The Plaintiffs reallege and incorporate Paragraphs 1 through 111.

205. The Public Employee Political Freedom Act of 1980 ("PEPFA"), Tenn. Code Ann. § 8-50-603 et seq., provides that it is unlawful for any public employer to discipline, threaten to discipline, or otherwise discriminate against an employee because the employee exercised the right to communicate with an elected public official.

206. PEPFA's purpose is to ensure free and open communication between public employees and elected officials by deterring public employers from retaliating against employees for such communication.

207. Plaintiff Birkes exercised his statutory right to communicate with an elected public official by emailing Councilperson Lovato on May 23, 2025 regarding fire fighter pay, retention, and public safety concerns, and by meeting with Councilperson Lovato at Fire Station 5 to discuss these issues.

208. Plaintiff Musumeci exercised his statutory right to communicate with an elected official by speaking with Councilperson Haywood in May 2025 regarding poor working conditions at CFR stations, fire fighter pay, and safety concerns.

209. Plaintiff Stevens exercised his statutory right to communicate with an elected official by speaking with Councilperson Haywood in May 2025 regarding unsafe working

conditions at CFR fire stations, fire fighter pay, and safety concerns.

210. These communications were made by Plaintiffs as private citizens and were outside the scope of their official duties.

211. Defendants were aware of Plaintiffs' communications with Councilperson Lovato and Councilperson Haywood and viewed such outreach as part of their union advocacy.

212. Shortly after Plaintiffs' communications with Councilperson Lovato and Councilperson Haywood, Defendants willfully retaliated against and terminated Plaintiffs because they exercised their right to communicate with an elected official in violation of Tenn. Code Ann. § 8-50-603. Defendants' decision to terminate Plaintiffs was motivated, in whole or in part, by their protected communications with Councilpersons Lovato and Haywood, in conjunction with their union activity. Such retaliation was carried out knowingly, willfully, and in bad faith, with wanton and reckless disregard for Plaintiffs' clearly established statutory rights.

213. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered economic loss, emotional distress, humiliation, and other damages.

214. Pursuant to Tenn. Code Ann. § 8-50-603, Plaintiffs are entitled to recover compensatory damages, including lost wages, benefits, and other relief, as well as reasonable attorneys' fees and costs.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A. Declare that Defendants violated Plaintiffs' Constitutional rights by unlawfully depriving Plaintiffs of their rights and privileges secured by the First and Fourteenth Amendments to the United States Constitution;

B. Declare that Defendants violated Plaintiff IAFF Local 3180's rights under the First and Fourteenth Amendments to the United States Constitution, both directly and on behalf of its

46

members;

      C.      Declare that Defendants unlawfully retaliated against Plaintiffs in violation of the PEPFA, Tenn. Code Ann. § 8-50-603 et seq., and Tennessee public policy;

      D.      Order Defendants to rescind the retaliatory, discriminatory, unlawful, and otherwise improvident terminations issued to Plaintiffs;

      E.      Order a complete and accurate accounting of all the compensation and relief to which Plaintiffs are entitled;

      F.      Award Plaintiffs monetary damages in the form of back pay compensation, lost benefits, unpaid entitlements, plus pre-judgment and post-judgment interest;

      G.      Award Plaintiffs compensatory damages for the violations of Plaintiffs' rights and the harm to their reputation, humiliation, emotional and mental anguish, and for other financial and consequential harm and injuries they have suffered as a result of Defendants' violative conduct;

      H.      Award Plaintiffs punitive damages to redress the knowing, willful, wanton, reckless, and bad faith nature of Defendants' violations of Plaintiffs' Constitutional and statutory rights;

      I.      Order Defendants to make an offer of reinstatement to Plaintiffs, retaining their rank and seniority, or in the alternative, award front pay;

      J.      Award reasonable attorneys' fees and costs to Plaintiffs; and

      K.      Grant all other relief that the Court deems just and appropriate.

**JURY DEMAND: PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

Respectfully submitted,

/s/ Patrick Barrett
Patrick Barrett
Michael Hamilton
PROVOST UMPHREY LAW FIRM
4205 Hillsboro Pike #303
Nashville, TN 37215
PBarrett@provostumphrey.com
MHamilton@provostumphrey.com


/s/ Sammy Sugiura
Clark R. Gebhart
(*Pro Hac Vice* to be submitted)
Sammy Y. Sugiura
(*Pro Hac Vice* to be submitted)
MOONEY, GREEN, SAINDON, MURPHY &
WELCH, P.C.
1620 Eye Street, NW, STE 700
Washington, DC 20006
Phone: 202-783-0010
Fax: 202-7883-6088
ssugiura@mooneygreen.com

***Counsel for Plaintiffs***

48